IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **LINDA SAVAGE,** | : |
| **Plaintiff** | : Civil No. 1:13-CV-00766 |
| v. | : |
| **CAROLYN W. COLVIN**<br>**Acting Comm'r of Soc. Sec.,** | : |
| | : **Judge Sylvia H. Rambo** |
| **Defendant** | : |

# **M E M O R A N D U M**

Presently before the court is Plaintiff's appeal of a final decision by the Social Security Commissioner denying Plaintiff's claim for Supplemental Security Income benefits under Title XVI of the Social Security Act. Plaintiff contends that the administrative decision, concluding that she has not been disabled since March 1, 2010, is not supported by substantial evidence and contains errors of law. For the following reasons, the court will affirm the decision of the Commissioner.

**I.     Background**

    **A.     Procedural History**

On March 25, 2010, Plaintiff, Linda Savage, protectively filed for Supplemental Security Income ("SSI") benefits under Title XVI of the Social Security Act. (Doc. 8-3, p. 12 of 13; Doc 8-2, p. 17 of 46.) In her application for SSI, Plaintiff claimed that she had been disabled since March 1, 2010. (Doc. 8-5, p. 2 of 14.) On June 9, 2010, the Social Security Administration initially denied Plaintiff's claim. (Doc. 8-4, p. 6 of 63.)

Upon Plaintiff's request, a hearing was held before ALJ Patrick Cutter on July 20, 2011, during which both Plaintiff and Patrick Anderson, a vocational expert, provided testimony. (Doc 8-2, pp. 22-23 of 46.) On September 22, 2011,

the ALJ denied Plaintiff's claim, finding that Plaintiff was not entitled to SSI benefits. (*Id.* at p. 9 of 46.) Plaintiff filed an appeal with the Appeals Council (*id.* at p. 7 of 46) which denied review on January 18, 2013, leaving the ALJ's decision as the final decision of the Social Security Commissioner (*Id.* at pp. 2-5 of 46). Consequently, Plaintiff commenced the instant action in this court on March 25, 2013. (Doc. 1.)

### B. Plaintiff's General Background

At the time of the hearing, Plaintiff was 31 years old (Doc. 8-2, p. 30 of 46) and was considered a "younger person"[1] whose age would not seriously affect her ability to adjust to other work. *See* 20 C.F.R. § 404.1563(c). Plaintiff resided with her boyfriend and four of her five children, who ranged in age from 18 months to 11 years old. (*Id.* at pp. 30-31, 35 of 46.) She had a limited education,[2] having completed school through the 9th grade (Doc. 8-2, p. 30 of 46), and she did not have a driver's license, nor had she ever attempted to obtain one. (*Id.* at p. 30 of 46.) Her past work history, which did not include working at the level of substantial gainful activity, included working as a kitchen helper, waitress, and fast food cook. (*Id.* at p. 43 of 46.)

### C. Medical Records

Plaintiff has received medical treatment for hereditary angioedema and scoliosis. (*See* Doc. 8-8, pp. 59-60, 70-71 of 90; Doc 8-10, p. 33-35 of 90.) On November 2, 2010, Plaintiff went to the emergency room ("ER") at the Carlisle

---

[1] The Social Security regulations use the term "younger person" to denote an individual aged 18 through 49 years. 20 C.F.R. § 404.1563(c).

[2] The Social Security regulations use the term "limited education" to denote formal education up to the "7th grade through the 11th grade." 20 C.F.R. § 416.964.

Regional Medical Center, complaining of lower back pain.  (Doc. 8-10, p. 35 of 90.)  On a scale of 0 through 10, with 0 representing no pain and 10 representing severe pain, Plaintiff rated her back pain at a 10.  (*See id.*)  A registered nurse, Tim Schuler, noted that Plaintiff, despite being in pain, was able to ambulate without difficulty and could "perform all activities of daily living without assistance."  (*Id.* at pp. 33-34 of 90.)  Plaintiff was prescribed cyclobenzaprine and Naprosyn for her back pain.  (*Id.* at p. 37 of 90.)  Additionally, Plaintiff started physical therapy at the Drayer Physical Therapy Institute ("Drayer") to address her lower back pain.  (*Id.* at p. 20 of 90.)  Drayer's records show that while Plaintiff has decreased joint mobility, range of motion, and strength, these limitations did not prevent her from being able to work.  (*See id.*)  Furthermore, an individualized plan was developed to address these limitations.  (*See id.* at pp. 21-24 of 90.)

   Plaintiff also suffers from exacerbations ("flare-ups") of her angioedema.  (*See* Doc. 8-7, p. 33 of 55; Doc. 8-8, pp. 59-60, 70-71 of 90.)  In 2006, Plaintiff experienced an acute flare-up of her angioedema.  (Doc. 8-7, p. 33 of 55.)  Her neck became swollen, requiring an emergency tracheostomy[3] and intubation at Hershey Medical Center ("Hershey") to ensure that her airway remained open.  (*See id.* at p. 33 of 55.)  On August 22, 2008, Plaintiff suffered another flare-up of her angioedema that also required intubation.  (*See* Doc. 8-8, pp. 70-71 of 90.)  After she was discharged from Hershey, Plaintiff was ordered to start C1-inhibitor therapy for prophylactic treatment of her angioedema.  (Doc. 8-7, p. 33 of 55.)  Flare-ups, however, continued to send Plaintiff to the ER several more times in the following months, although only one visit resulted in an intubation.  (*See* Doc. 8-8, pp. 59-60

---

[3] Plaintiff's tracheostomy has since been reversed.  (*See* Doc. 8-9, p. 113 of 121.)

of 90.) For the other ER visits, Plaintiff's flare-ups could be controlled through medication. (*See* Doc. 8-7, pp. 33-35 of 55.)

In 2010, Hershey's medical records showed that Plaintiff's last intubation was in 2008 and that her most recent flare-ups were not severe enough to require intubation. (See Doc. 8-10, pp.84-85 of 90.) The records also showed that Plaintiff experienced mild flare-ups "every two weeks per self report." (*Id.*) On February 21, 2010, Plaintiff's medical records showed that she was taking Amicar for prophylactic treatment of her angioedema. (Doc. 8-9, p. 73 of 121.) On November 23, 2010, Dr. Jhaveri noted that Plaintiff was no longer receiving C1-inhibitor therapy. (Doc. 8-10, p. 17 of 90.) Dr. Jhaveri also noted that Amicar had failed to adequately treat Plaintiff's flare-ups of angioedema and considered starting Plaintiff on Cinryze. Plaintiff started Cinryze in place of Amicar in early December of 2010. (*Id.* at p. 18 of 90.) On December 29, 2010, Dr. Jhaveri noted that "[s]ince starting Cinryze, [Plaintiff] has had no angioedema attacks." (*Id.* at 17 of 90.)

### D.   **Hearing Testimony**

Prior to testimony being given, Plaintiff requested that the ALJ reopen her prior SSI claim that she had filed on May 15, 2009. (Doc. 8-2, pp. 26-27 of 46.) Once Plaintiff began testifying, Plaintiff described how her hereditary angioedema affects her. (*See id.* at p. 31 of 46.) According to Plaintiff, her flare-ups cause various parts of her body to swell approximately once a week, for a period of three days. (*Id.* at pp. 32-34 of 46.) Plaintiff testified that these flare-ups have worsened with age and that when she is swollen she "just stay[s] home and deal[s] with it." (*Id.* at pp. 34, 37 of 46.) During the hearing, Plaintiff's counsel noted that Plaintiff was currently experiencing a flare-up: "[I]f you . . . observe her feet and her hands,

there is some slight swelling." (*Id.* at p. 29 of 46.) To control her angioedema, Plaintiff takes Cinryze, although she does not take any additional medication during her flare-ups. (*Id.* at p. 32 of 46.)

Plaintiff also testified that pain is associated with her flare-ups. (*Id.* at p. 39 of 46.) Plaintiff stated that "my whole foot [hurts] right now. It's swollen, you know, because it's a big swelling." (*Id.* at p. 40 of 46.) Plaintiff rated her pain level at a 7 or 8 out of 10 while sitting and a 10 while walking. (*Id.* at p. 39 of 46.) Plaintiff denied being able to work during a flare-up and stated that she quit her previous job at All American Plazas in 2002 because "they wouldn't let me take the days off I needed when I was swollen." (*Id.* at pp. 31, 36 of 46.)

Plaintiff further described the symptoms she experiences during her flare-ups. (*Id.* at p. 32, 37.) She testified that, since beginning Cinryze, she has not had any "throat attacks," but continues to have outbreaks of swelling in other parts of her body, primarily in her hands and feet. (*Id.* at p. 32 of 46.) Plaintiff added that the swelling could affect "my one foot or my one hand. I can never tell what it's ever gonna be." (*Id.*) Plaintiff testified that she has been experiencing flare-ups once a week for the past few years, going back at least until May of 2009. (*Id.* at p. 37 of 46.)

Plaintiff described a typical day for herself as waking at 8 a.m. (*Id.* at p. 34 of 46.) After arising, Plaintiff prepares breakfast for her children and helps them gets dressed. (*Id.* at pp. 34-35 of 46.) She then performs household activities such as washing dishes. (*Id.* at p. 34 of 46.) Plaintiff shares the responsibility of grocery shopping with her boyfriend. (*Id.*) On days when she has flare-ups, Plaintiff still rises at 8 a.m. (*Id.*) However, Plaintiff testified that she will "stay on

the couch more . . . I'm probably not even on my feet an hour." (*Id.* at p. 34, 39 of 46.)  Plaintiff admitted that she is able to walk while her feet are swollen but stated that she will not perform household activities or cook meals for her children.  (*Id.* at pp. 35-36 of 46.)  Instead, Plaintiff will heat already prepared meals in the microwave and have the children remove the meals themselves.  (*Id.* at p. 35 of 46.)  Finally, Plaintiff testified that, when her hands are swollen, she is unable to bend her fingers, grip a hairbrush or toothbrush, or otherwise perform household activities:

> Q: Are you staying pretty much in bed when you have [an] outbreak in your hands, too, then?
>
> A: Mainly, because I mean, I can – it don't hurt to walk, but to go do something even, I don't do it.

(*Id.* at p. 41 of 46.)

After Plaintiff finished testifying, the ALJ posed the following hypothetical to Patrick Anderson, a vocational expert: "[A]ssume an individual who has the same vocational profile, and who has the residual functioning capacity to perform a range of medium work as described in the regulations.  With the particular RFC, would somebody have any work available to them?"  (*Id.* at p. 44 of 46.)  Based on the hypothetical, Mr. Anderson opined that an individual having the same limitations as Plaintiff could perform work as a store laborer, injection molding machine tender, and order clerk for food and beverages.  (*Id.*)  Mr. Anderson provided the following testimony regarding the availability of these occupations:

> [L]aborer, stores.  That's a medium exertional position, unskilled, SVP of 2, with a DOT code of 922687058. And the numbers there, Your Honor, would be approximately 2,500 [positions in the] local labor market, 31,000 several regions, 705,000 nationally . . . [An] [e]xample of [a] light

> [exertional position] would be injection molding machine tender. It's a machine tender in the plastic's industry. DOT Code 556685038, light, unskilled, SVP of 2 . . . [A] [s]edentary example would be order clerk, food and beverage. DOT Code 209567014, sedentary, unskilled, SVP of 2. 900 local labor market, 5,500 several regions. 128,000 nationally.

(*Id.* at pp. 44-45 of 46.)

Thus, based on these hypotheticals, Mr. Anderson suggested that jobs suitable for Plaintiff's limitations as posed by the ALJ exist in the regional economy. (*See id.*) The ALJ, however, posed a second hypothetical to Mr. Anderson, further expanding the hypothetical limitations. (*Id.* at p. 45 of 46.) Under this hypothetical, Mr. Anderson was told to consider the additional factor of absences "from work one to two times a month consistently, because of symptoms related to . . . a chronic condition that flares multiple times." (*Id.*) Under this hypothetical, Mr. Anderson opined that the individual would have no competitive employment. (*Id.*)

## II.        **Standard of Review**

A district court's review of a Commissioner's decision is limited. *See Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 359 (3d Cir. 2011). A district court has plenary power over the Commissioner's legal conclusions but is bound by the Commissioner's factual findings if the findings are supported by substantial evidence. *See id.*; *Brownawell v. Comm'r of Soc. Sec.*, 554 F.3d 352, 355 (3d Cir. 2008). Substantial evidence is "more than a mere scintilla. It [is] such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Brownawell*, 554 F.3d at 355. A single piece of evidence may not constitute substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. *Kent v. Schweiker*, 710 F.2d 110, 114 (3d

Cir. 1983). When determining whether substantial evidence exists, a court is not permitted to "re-weigh the evidence or impose [its] own factual determinations." *Chandler*, 667 F.3d at 359.

### III. Discussion

#### A. Administrative Framework

Under the Social Security Act, claimants are considered disabled only if their "physical or mental impairments . . . are of such severity that [they are] not only unable to do [their] previous work but cannot, considering [their] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Smith v. Comm'r of Soc. Sec.*, 631 F.3d 632, 634 (3d Cir. 2010). In making this determination, an ALJ follows a five-step sequential analysis. *Id.* The ALJ reviews:

> (1) the claimant's current work activity; (2) the medical severity and duration of the claimant's impairments; (3) whether the claimant's impairments meet or equal the requirements of an impairment listed in the regulations; (4) whether the claimant has the residual functional capacity ["RFC"] to return to past relevant work; and (5) if the claimant cannot return to past relevant work, whether [they] can make an adjustment to other work in the national economy.

*Id.* (internal quotation marks omitted). In this sequential analysis, the claimant bears the burden of proof during steps one through four, but the Commissioner bears the burden of proof during step five. *Id.*

#### B. ALJ's Decision

The ALJ decided not to reopen Plaintiff's prior application for SSI. (Doc. 8-2, p. 17 of 46.) Then, following the sequential analysis, the ALJ concluded that Plaintiff's angioedema and obesity constituted severe impairments and that Plaintiff had the RFC to "perform the full range of medium work" as defined by the

Social Security regulations. (*Id.* at pp. 13-14 of 46.) In determining Plaintiff's RFC, the ALJ considered the following: Plaintiff's medical impairments and medical history, Plaintiff's testimony, and both Dr. Craig's and Dr. Ferraro's medical source statements. (*See id.* at pp. 14-16 of 46.) Regarding Plaintiff's medical history, the ALJ noted that Plaintiff's medical records from Hershey show that prior to Plaintiff starting Cinryze, Plaintiff suffered swelling in her throat that periodically resulted in hospitalizations. (*Id.* at p. 15 of 46.) The ALJ further noted, however, that since Plaintiff started taking Cinryze, Hershey's records show that Plaintiff suffered no further flare-ups of angioedema. (*Id.*) Additionally, the ALJ noted that despite being advised to stop smoking, Plaintiff continues to smoke, and, therefore, "there is some question regarding [Plaintiff's] seriousness in addressing her angioedema." (*Id.*)

Regarding Plaintiff's testimony, the ALJ found that Plaintiff was "not fully credible." (*Id.*) The ALJ reasoned that Plaintiff's testimony that Cinryze provides good relief for throat swelling, but not the swelling of her hands and feet, was unpersuasive in light of the medical records from Hershey. (*See id.*) Although the ALJ did not doubt that Plaintiff suffered from the symptoms she claimed to experience, the ALJ found that Plaintiff's "testimony regarding the frequency or severity/intensity of hand and feet swelling to be [unpersuasive] to the extent alleged." (*Id.* at pp. 15-16 of 46.) Furthermore, the ALJ found that Plaintiff's claim that she must be excused from work at least three times a month was unpersuasive and unsupported by the record as a whole. (*Id.* at p. 16 of 46.)

Finally, the ALJ accorded the medical source statements of Dr. Craig and Dr. Ferraro "little weight" when determining Plaintiff's RFC. (*Id.*) In his

medical source statement, Dr. Craig opined that Plaintiff suffered from no exertional, postural, or manipulative limitations from her angioedema. (Doc. 8-10, pp. 87-90 of 90.) Dr. Craig further opined that Plaintiff's ability to stand or walk was not affected by her angioedema. (*Id.* at p. 87 of 90.) In fact, the only comment that Dr. Craig made in his medical source statement in support of Plaintiff's claim for SSI is that Plaintiff "will need frequent days off for illness secondary to her genetic disease." (*Id.* at p. 90 of 90.) Dr. Craig, however, provided no further explanation of what limitations Plaintiff suffered that would necessitate frequent absences from work. (*See id.* at pp. 87-90 of 90.) Consequently, the ALJ accorded this opinion "little weight" because it was "not supported by the record as a whole." (Doc. 8-2, p. 16 of 46.) In Dr. Ferraro's medical source statement, Dr. Ferraro opined that Plaintiff had no limitations regarding lifting or carrying objects. (*Id.*) Because Plaintiff had testified that her angioedema periodically limits her ability to fully use her hands, however, the ALJ found that this opinion was also not supported by the record as a whole. (*See id.*)

Using Plaintiff's RFC determination, the ALJ then applied the medical-vocational guidelines ("grids"), promulgated by the Social Security Administration, to make a finding that Plaintiff possessed job-related skills and concluded that "jobs . . . exist in significant numbers in the national economy that [Plaintiff] can perform." (*See id.* at p. 17 of 46.) Therefore, the ALJ found that Plaintiff is not disabled as defined by the Social Security Act. (*Id.*)

### C. Plaintiff's Arguments

Plaintiff raises five arguments in support of her appeal. (Doc. 11, pp. 6-7 of 17.) Specifically, Plaintiff contends that the ALJ erred by failing to: (1)

properly determine her RFC; (2) accord adequate weight to the opinions of her treating physicians; (3) obtain specific vocational testimony on jobs that she was capable of performing; (4) reopen her prior claim; and (5) find her credible. (*Id.*) The court will address each of these contentions in turn.

### 1. **Plaintiff's RFC**

Plaintiff contends that the ALJ erred in determining her RFC. (*See id.* at p. 7 of 17.) Specifically, Plaintiff contends that the ALJ failed to: (1) address whether his RFC determination was Plaintiff's RFC during flare-ups or when she was "normal;" and (2) determine Plaintiff's RFC during hospitalizations for flare-ups. (*Id.* at pp. 10-11 of 17.) A plaintiff's RFC determination is the exclusive responsibility of the ALJ, *Garrett v. Comm'r of Soc. Sec.*, 274 F. App'x 159, 163 (3d Cir. 2008), and "reflects what the [plaintiff] can still do despite [his or her] limitations." *Salles v. Comm'r of Soc. Sec.*, 229 Fed. App'x 140, 147 (3d Cir. 2007). In making the RFC determination, an ALJ "must consider all [of the] evidence before him," although the ALJ is not required to consider evidence that he finds not credible. *Id.*

In the instant case, the ALJ properly determined Plaintiff's RFC. Plaintiff mistakenly assumes that the ALJ was required to make multiple RFC determinations although no such requirement exists. Instead, the ALJ was only required to make one RFC determination, upon consideration of all of the evidence before him, that reflected what Plaintiff could do despite her limitations. This the ALJ did. The ALJ explicitly stated that he considered Plaintiff's testimony regarding her symptoms, Plaintiff's medical impairments and medical history, and

the opinions of Plaintiff's treating physicians. Therefore, it is apparent from his decision that the ALJ considered Plaintiff's flare-ups when determining her RFC.

Plaintiff refers to *Rocco v. Heckler*, 826 F.2d 1348 (3d Cir. 1987), to support her contention that the ALJ was required to make two RFC determinations. (Doc. 11, p. 11 of 17.) In *Rocco,* the court held that the ALJ failed to consider the plaintiff's frequent hospitalizations when considering the plaintiff's RFC. *Rocco*, 826 F.2d at 1350-51. The court reasoned that the plaintiff's frequent hospitalizations would affect his ability to work on a "regular, continuing[,] [and] sustained basis." *Id.* at 1350. The court did not, however, require that the ALJ make two separate RFC determinations. *See id.* at 1350-51.

Plaintiff argues that the ALJ erred "in failing to [determine] what . . . Plaintiff's [RFC] . . . was during hospitalizations for flare-ups." (Doc. 11, p. 11 of 17.) As previously stated, the ALJ did not need to make more than one RFC determination. Furthermore, the ALJ considered the possibility of future hospitalizations in Plaintiff's RFC determination. The ALJ, however, simply found that the possibility of future hospitalizations was low when medical records showed that Plaintiff had not suffered from flare-ups since starting Cinryze. Therefore, the ALJ's RFC determination was not improperly determined and is supported by substantial evidence.

### 2. **Plaintiff's Treating Physician**

Additionally, Plaintiff contends that the ALJ failed to accord adequate weight to the opinion of her treating physicians, Dr. Craig and Dr. Ferraro. (*Id.* at p. 12 of 17.) Specifically, Plaintiff contends that the ALJ failed to: (1) adequately explain why he rejected the physicians' opinions and (2) note that Dr. Ferraro's

12

opinion "applied only when . . . Plaintiff [is] not acutely affected by angioedema." (*Id.*) While an opinion of a treating physician is normally accorded great weight, an ALJ "may reject a treating physician's opinion outright . . . on the basis of contradictory medical evidence." *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999).

In the instant case, the ALJ did not fail to adequately explain why he rejected Dr. Craig's and Dr. Ferraro's opinions. The ALJ stated that he accorded each opinion "little weight" because the opinions were "not supported by the record as a whole." (Doc. 8-2, p. 16 of 46.) Plaintiff, however, contends that this reasoning is insufficient. (Doc. 11, p. 12 of 17.) Plaintiff cites to *Carter v. Apfel* in support of this contention. *Carter v. Apfel*, 220 F. Supp. 2d 393 (M.D. Pa. 2000). In *Carter*, the ALJ never once mentioned a physician's opinion in his reasoning, and, therefore, the court was unable to discern whether the ALJ had considered the opinion or not. *Id.* at 396-97. The court noted that an ALJ must provide "some indication of the evidence which was rejected . . . [Boilerplate language] that he considered the entire record is [not] sufficient to show that he [in fact] considered all [of] the evidence." *Id.* In this case, however, the ALJ properly showed that he accorded both opinions little weight due to their lack of support from the record. No further explanation was necessary.

Furthermore, the ALJ did not err in according adequate weight to Dr. Ferraro's opinion by failing to note that the opinion applied only when Plaintiff is not acutely affected by angioedema. In his medical source statement, Dr. Ferraro, who treated Plaintiff for issues related to her airway only, opined that Plaintiff did not suffer from any limitations but wrote in hand at the end of his statement that

13

"when [Plaintiff] is not acutely affected [by a flare-up]. . . she is not limited in any way. This is not to say that she does not have physical impairments [but] that [those impairments] are manage[d] by other physicians." (Doc. 8-9, p. 104 of 121.) Dr. Ferraro, therefore, had no knowledge of any physical impairments caused by Plaintiff's angioedema. While the ALJ noted that Dr. Ferraro opined that "[Plaintiff] has no limitations regarding lifting/carrying" and did not expressly note that Dr. Ferraro had qualified his opinion to characterize Plaintiff's non-acute condition only, any error that occurred was minor in nature and not reversible. (Doc. 8-2, p. 16 of 46.) The ALJ could not have accorded the opinion more weight when Dr. Ferraro had no knowledge of the physical impairments caused by Plaintiff's angioedema. Therefore, the ALJ did not fail to accord adequate weight to Plaintiff's treating physicians' opinions.

### 3. **Vocational Testimony**

Plaintiff also contends that the ALJ failed to make a finding of specific jobs that Plaintiff can perform in the economy.[4] (Doc. 11, p. 13 of 17.) Instead of making a specific finding of what jobs Plaintiff can perform, the ALJ applied the grids to find that Plaintiff possesses job-related skills and that, therefore, "jobs . . . exist in significant numbers in the national economy that [Plaintiff] can perform." (*See* Doc. 8-2, p. 17 of 46.) The Third Circuit has held that "at a general level . . .

---

[4] Additionally, Plaintiff contends that the ALJ failed to include all "Plaintiff's impairments supported by the record in his hypothetical to the Vocational Expert. [S]pecifically[,] [the ALJ did not include] any additional limitations Plaintiff had during a flare-up of her angioedema." (Doc.11-2, p.14 of 17.) Because the ALJ asked the Vocational Expert to consider a hypothetical individual "who has the [RFC] to perform a range of medium work," this argument goes toward the ALJ's RFC determination, which the court has already held is supported by substantial evidence. Furthermore, the ALJ determined that Plaintiff had the RFC to perform a range of medium work during her flare-ups and, therefore, did not need to include in his hypothetical the additional limitations Plaintiff claimed to experience that the ALJ found were not credible. (*See* Part III.C.1, *infra* Part III.C.5.)

14

the grids cannot automatically establish that there are jobs in the national economy *when a claimant has severe exertional and nonexertional impairments.*" *Sykes v. Apfel*, 228 F.3d 259, 267(3d Cir. 2000) (emphasis added). Only when a plaintiff has severe exertional and nonexertional impairments, therefore, may an ALJ not exclusively rely on the grids. *See id.*

In the instant case, the ALJ found that Plaintiff did not suffer from severe exertional and nonexertional impairments. The ALJ, therefore, could exclusively rely on the grids and did not need to make a finding of specific jobs that Plaintiff is capable of performing. Consequently, the ALJ satisfied his burden that work exists in the national economy that Plaintiff can perform.

### 4. **Plaintiff's Prior Claim**

Plaintiff contends that the ALJ erred by failing to reopen Plaintiff's prior claim. (Doc. 11, p. 14 of 17.) When a plaintiff "files the same claim for benefits after a final administrative or judicial decision on the merits, the initial claim may be reopened and reconsidered along with any new evidence provided in the subsequent application for benefits." *Purter v. Heckler*, 771 F.2d 682, 691 (3d Cir. 1985). It is well settled, however, "that federal courts lack jurisdiction . . . to review the Commissioner's discretionary decision to decline to reopen a prior application . . . on *res judicata* grounds." *Tobak v. Apfel*, 195 F.3d 183, 187 (3d Cir. 1999). Because this type of administrative decision "does not require a hearing, it is not a final decision . . . [that is] required for" a federal court to have jurisdiction. *Id.* An exception exists, however, that allows federal courts to have jurisdiction, when the case contains a constitutional question that is "unsuited to resolution in the

administrative hearing procedures." *Id.* (quoting *Califano v. Sanders*, 430 U.S. 99, 109 (1977)).

In the instant case, the court lacks jurisdiction to decide whether the ALJ erred in filing to reopen Plaintiff's prior claim. Because there was no hearing on whether or not to reopen the prior claim, the decision to not reopen the prior claim is not final. Furthermore, Plaintiff fails to raise any colorable constitutional claim that would grant this court jurisdiction over the issue. Therefore, the issue of whether the ALJ erred in failing to reopen Plaintiff's prior claim cannot be reviewed at this time.

### 5. **Plaintiff's Credibility**

Finally, Plaintiff contends that the ALJ improperly evaluated her credibility. (Doc. 11, p. 15 of 17.) Specifically, Plaintiff contends that the ALJ failed to: (1) explain "how he evaluated . . . Plaintiff's testimony regarding the frequency and severity of swelling in her hands, feet[,] and throat" and (2) "recognize the . . . additional limitations in functioning [that Plaintiff experienced] during flare-ups." (*Id.* at pp. 15-16 of 17.) When assessing the credibility of the plaintiff, the ALJ is not required to accept the plaintiff's claims as true. *Jenkins v. Astrue*, 836 F.Supp.2d 211, 225 (M.D. Pa. 2011). Instead, "[a]llegations of . . . subjective symptoms must be supported by objective medical evidence." *Hartranft v. Apfel*, 181 F.3d 358, 362 (3d Cir. 1999). Once a credibility determination is made by an ALJ, that determination is given great weight and deference because of the ALJ's duty of observing a witness's demeanor. *Id.*

In the instant case, the ALJ did not improperly evaluate Plaintiff's credibility. While the ALJ did not doubt that Plaintiff suffered from the symptoms

16

she claimed to experience, the ALJ found that Plaintiff was "not fully credible" because her testimony regarding the extent of her limitations was not supported by the objective medical evidence. (Doc. 8-2, p. 16 of 46.) The ALJ noted that medical records show that Cinryze provides Plaintiff with good relief from the symptoms of her angioedema. Furthermore, the ALJ recognized the limitations Plaintiff experiences during flare-ups but found that the extent of the limitations Plaintiff claimed to experience was not credible. The court thus finds that the ALJ properly assessed Plaintiff's credibility.

**IV.** **Conclusion**

Based on the foregoing reasons and after a thorough review of the administrative record, the court concludes that the Commissioner's decision denying Plaintiff's claim for SSI benefits is supported by substantial evidence. The court will therefore affirm the decision of the Commissioner.

An appropriate order will issue.

                                                                       s/Sylvia H. Rambo
                                                                       United States District Judge

Dated: April 17, 2014.